FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

OCT 07 2010

JAMES W. McCORMACK, CLERK

By:_____ DEP CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>YVONNE DOOLEY,<br><br>                    Plaintiffs,<br><br>v.<br><br>PINNACLE PHYSICIANS GROUP (Clinic 1)<br>122 Cordoba Center Dr.<br>Hot Springs, AR 71909,<br><br>PINNACLE PHYSICIANS GROUP (Clinic 2)<br>1636 Higdon Ferry Road<br>Hot Springs, AR 71913,<br><br>PINNACLE PHYSICIANS GROUP (Clinic 3)<br>1003 Schneider Dr.<br>Malvern, AR 72104,<br><br>PINNACLE PHYSICIANS GROUP (Clinic 4)<br>1003 Schneider Dr.<br>Malvern, AR 72104,<br><br>PINNACLE PHYSICIANS GROUP (Clinic 5)<br>1003 Schneider Dr.<br>Malvern, AR 72104,<br><br>McCallum, Jennifer A. MD<br>1003 Schneider Dr.<br>Malvern, AR 72104,<br><br>Higginbotham, Shane MD<br>1003 Schneider Dr.<br>Malvern, AR 72104,<br><br>Tilley, Absolam MD<br>1003 Schneider Dr.<br>Malvern, AR 72104<br><br>Jennings, Janna L. MD<br>1003 Schneider Dr.<br>Malvern, AR 72104, | CASE NO. 4:10 cv 1456 DPM<br><br>Complaint and Jury Demand<br><br>**TO BE FILED <u>UNDER SEAL</u><br>PURSUANT TO 31 U.S.C. § 3730<br>(b)(2). <u>DO NOT SERVE</u>**<br><br><br><br>This case assigned to District Judge Marshall<br>and to Magistrate Judge Volpe |

Bozeman, Zarena MD                          )
1003 Schneider Dr.                          )
Malvern, AR 72104,                          )
                                            )
Tilley Diagnostic Clinic, Inc. PA           )
109 W Pine St., Ste. A                       )
Sheridan, AR,                               )
                                            )
                    Defendants.             )

## **INTRODUCTION**

This is an action by *qui tam* Relator Yvonne Dooley (Relator), through the undersigned

counsel, made on behalf of herself and the United States of America (United States) to recover

damages and penalties arising from Defendants Pinnacle Physicians Groups, consisting of 5

clinics; Dr. Tilley, Dr. Jennings, Dr. Bozeman; Tilley Diagnostic Clinic, Inc. PA (Laboratory),

and upon information and belief Dr. McCallum and Dr. Higginbotham  (collectively

"Defendants") using, making, presenting or causing to present false statements and claims to the

government in violation of the False Claims Act, 31 U.S.C. § 3729 *et. seq.*  The Defendants

wrongfully obtained and retained substantial funds from government healthcare programs,

including Medicare, Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIPS, and

Veterans Administration ("VA") [collectively "government healthcare programs" or "Medicare"

for short] through false claims and false statements made in connection with medical services

provided by Defendants since at least 2001 through the present.

Under the terms of the False Claims Act, this Complaint is to be filed in camera and

under seal and is to remain under seal for a period of at least sixty days and shall not be served

on the Defendants until Court so orders.  The Government may elect to intervene and proceed

with the action within the next sixty day time frame, or within any extension of that initial sixty

day period granted by the Court for good cause shown, after the Government receives both the

Complaint and the Material Evidence submitted to it.

For her cause the Relator alleges as follows:

## NATURE OF ACTION

1. This is an action to recover treble damages and civil penalties under the False Claims

Act, 31 U.S.C. §§ 3729-3733

2. Under the False Claims Act, a private person may bring an action in federal district

court for herself and for the United Sates, and may share in any recovery.  31 U.S.C. § 3730 (b).

That a private person is known as a "Relator" and the action that the Relator brings is called a

*qui tam* action.

## JURISDICTION

3.  This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§

1331 and 1335.

4. The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §

3732(a) because at least one of the Defendants transacts and has transacted business in this

District.

## VENUE

5. Venue is proper in this District under 31 U.S.C. §3732 and 28 U.S.C. § 1391 (b) and

(c) because at least one of the Defendants resides and or transacts business in this District.

## PARTIES

6. The Relator brings this action on behalf of the United States, including its agency, the

Department of Health and Human Services ("HHS") and its component, the Centers for

Medicare and Medicaid Services ("CMS", formerly the Health Care Financing Administration

("HCFA"), TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIPS, and Veterans
Administration ("VA") and all other federal healthcare programs, hereafter referred to
collectively as "Medicare" for ease of alleging misconduct.

7. The Relator also brings this action on behalf of herself, as permitted under the False
Claims Act. Relator Yvonne Dooley is a citizen of the United States and a resident of Garland
County in the state of Arkansas. Yvonne Dooley has direct and independent knowledge, within
the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations set forth
in this Complaint are based. Yvonne Dooley has knowledge of the false claims and records that
Defendants knowingly, falsely and fraudulently submitted to the federal government as alleged
herein.

Physician Groups Defendants

8. The Defendant Physicians Groups and their officers listed below are hereinafter
referred to as "Physicians Groups Defendants."

9. Pinnacle Physicians Group 1, 122 Cordoba Center Dr. Hot Springs, AR 71909. Dr.
Absolam Tilley is the owner of Pinnacle Physicians Group 1.

10.     Pinnacle Physicians Group 2, 1636 Higdon Ferry Road. Hot Springs, AR 71913.
Dr. Absolam Tilley is the owner of Pinnacle Physicians Group 2.

11.     Pinnacle Physicians Group 3, 1003 Schneider Dr. Malvern, AR 72104. Dr.
Absolam Tilley is the owner of Pinnacle Physicians Group 3.

12.     Pinnacle Physicians Group 4, 1003 Schneider Dr. Malvern, AR 72104. Dr.
Absolam Tilley is the owner of Pinnacle Physicians Group 4.

13.     Pinnacle Physicians Group 5, 1003 Schneider Dr. Malvern, AR 72104. Dr,
Absolam Tilley is the owner of Pinnacle Physicians Group 5.

14.     Pinnacle Physicians Groups 3-5 are located in the same office building complex.

Physicians Defendants

15. The Defendant Physicians and their officers listed below are hereinafter referred to as "Physician Defendants."

16. McCallum, Jennifer A. MD; 1003 Schneider Dr. Malvern, AR.

17. Higginbotham Shane MD, 1003 Schneider Dr. Malvern, AR.

18. Absalom Tilley A H MD, 1003 Schneider Dr. Malvern, AR.

19. Jennings Janna L MD, 1003 Schneider Dr. Malvern, AR.

20. Zarena Bozeman MD, 1003 Schneider Dr. Malvern, AR.

Laboratory Defendant

21.     The Defendant laboratory and their officers listed below are hereinafter referred to as "Laboratory Defendant" or the "Laboratory."

22.     Tilley Diagnostic Clinic, Inc. PA. (Laboratory) 109 W. Pine St., Ste. A, Sheridan, AR.  This Diagnostic Clinic (Laboratory) is owned by Dr. Absolam Tilley.

23.     At all times material to this Complaint, each of the Defendants have participated in Medicare, Medicaid, and TRICARE/CHAMPUS, VA, and all other federal healthcare programs and have received substantial revenues from these government healthcare programs.

THE MEDICARE PROGRAM

24. In 1965, Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals.  42 U.S.C. §§ 1395 et seq.

25.   Medicare consists of two parts.  Part A provides coverage for hospital costs, services rendered by skilled nursing facilities, home health care, and hospice care.  Part B, on the other

hand, provides coverage for physician services, outpatient hospital care, and other miscellaneous medical services such as physical and occupational therapy. *See* 42 U.S.C. §§ 1395j-1395w-4.

26. The U.S. Department of Health and Human Services ("HHS") is an agency of the United States whose activities, operations, and contracts are paid from federal funds. The Centers for Medicare and Medicaid Services ("CMS") is a division of HHS that is responsible for the administration and supervision of the Medicare program. For the purpose of administering Part A and Part B Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to receive, review, and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395u.

27. Medicare providers such as Defendants have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984).

28. To submit claims electronically, Medicare providers execute an Electronic Data Interchange Enrollment Form which contains several provisions including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Thus, under Medicare, it is illegal to provide and bill for medically unnecessary services and equipment.

29. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition. See 42 U.S.C. § 1395y(a)(1)(A).

30. Seeking payment for higher coded procedures when less expensive procedures or tests were actually performed is an act to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition. See 42 U.S.C. § 1395y(a)(1)(A).

31. Seeking payment by double billing for a single service provided is an act to obtain reimbursement for a service that is not warranted b the patient's current and documented medical condition. See 42 U.S.C. § 1395y(a)(1)(A).

## FACTUAL ALLEGATIONS

32. From at least 2001 through the present, and upon information and belief prior to 2001, Defendants have knowingly engaged in systematic false and fraudulent schemes to defraud government healthcare programs out of significant amounts of money.

33. Relator, Yvonne Dooley (Relator), was employed by Pinnacle Physicians Group in November 2009 through July 2010 as an Office Coordinator.  In 2009 Relator was directly employed by Pinnacle Physicians Group as the Office Coordinator.

34. During the Course of her employment, Relator discovered that Defendants were involved in an ongoing scheme of filing false claims for Medicare (and other government healthcare programs) reimbursement.

35. Defendants have been knowingly submitting false claims to Medicare through a variety of improper schemes, including but not limited to falsely and fraudulently (1) upcoding, seeking payment for higher coded tests or procedures when less expensive tests or procedures were performed, (2) double billing for a single service provided, (3) billing for unnecessary medical services, (4) retaining patients longer than medically necessary (5) paid or received kickbacks and other improper enumerations, and engaged in improper self-referrals to the Laboratory Defendant, which is owned by the same owner of Pinnacle Physicians Clinic 1-5 (i.e.

Dr. Tilley), in violation of federal laws and regulations, (6) using non clinical or administrative employees to perform clinical tests on patients and then fraudulently billing Medicare for those tests which should only be performed by a clinical employee, and (7) used company corporate accounts to pay personal bills, taxes, vacations and other expenses.

## DEFENDANTS KNEW THEY WERE COMMITTING FRAUD

36. Relator was told during several conversations with co-worker Judy Howard that she "knew they would all go to jail if anyone ever audited the clinic."

37. Relator was told during conversations with other co-workers in which they stated that they were concerned about the fraudulent billing practices and did not want to go to jail for fraud.

38. Defendant Physicians Groups held weekly staff meetings where they told employees, including Relator, how to commit the various fraud schemes.

39.    Relator was told that the same fraudulent misconduct was occurring at all of the clinics.

40.    Upon information and belief, the Defendants paid bonuses to those who were most active in fraudulent billings. There was even competition among some employees to see who could become the top provider by engaging in the most fraud.

## UPCODING: DEFENDANTS CODED FOR HIGHER PROCEDURES WHEN LESS EXPENSIVE PROCUDEURES WERE PERFORMED

41. Medicare providers use a uniform coding system to receive reimbursement for professional services, procedures, and supplies that are provided to Medicare participants.

42. For all purposes relevant to this action, Medicare adopted The International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") and American Association's Physicians' Current Procedural Terminology ("CPT") Code Book.  Medicare

providers are required to submit ICD-9-CM diagnosis codes and CPT treatment codes to

Medicare to obtain reimbursement.

43. The forward of the CPT Book explains: "[t]he purpose of the terminology is to

provide a uniform language that will accurately describe medical, surgical, and diagnostic

services, and will thereby provide an effective means for reliable nationwide communication

among physicians, patients, and third parties."

44. Medicare uses a coding system because it gives health care providers "a common

language that accurately describes the kinds and levels of services provided and that can serve as

a basis for coverage and payment determinations." *See* 42 C.F.R. § 405.512.

45. CMS reimburses health care providers such as Pinnacle Physicians Group through the

ICD-9-CM and CPT coding systems.  These codes provide various levels of reimbursement

based on patient diagnoses and treatments provided.

46. As a Medicare provider, Pinnacle Physicians Group is required to comply with the

Medicare statutes and regulations, as well as the ICD-9-CM and CPT Code Books, when

submitting claims to Medicare for reimbursement.

47. Under Medicare, it is illegal to code or bill for services not actually rendered, to

provide medically unnecessary services, and to upcode bills.

48. The assignment of improper ICD-9-M codes and CPT codes, with respect to claims

submitted to the Medicare program for reimbursement, is a misrepresentation to the United

States, as to the services provided and appropriate reimbursement due.

49. Upcoding is the assignment of an improper ICD-9-M code and/or CPT code in order

to increase the amount of reimbursement that a health care provider receives.

50. Defendants Physicians Groups have engaged in a variety of schemes to upcode in order to systematically overbill Medicare.

51. For instance, upon information and belief, each patient who was scheduled for an MRI test or any radiology screening was automatically billed for administration of magnesium. Magnesium was not used in the MRI testing nor was it used in radiology screening. For this one test alone, the additional charge billed to Medicare was approximately $85.00 per test ordered. This number multiplied by hundreds of patients over the course of 10 years adds up to hundreds of thousands of dollars.

52. Defendants Physicians Groups regularly ordered a complete blood count (CBC) for a patient in the emergency room or outpatient services, then upcoded and billed Medicare for additional blood chemistry tests, known as "CBC indices," that doctors hadn't ordered.

53. Defendants Physicians Groups ordered a "chemistry profile" for a patient in the emergency room or outpatient services, then self referred to Laboratory Defendant where the "chemistry profile" was upcoded to reflect metabolic tests that were not ordered, as well as upcoded to reflect the administration of certain saline solutions or antibacterial solutions which were not ordered and not used.

54. Defendants Physicians Group told employees that if a patient comes in with depression or anxiety they are to upcode from depression or anxiety to another diagnosis or (dx) because "insurance does not pay well for depression or anxiety."

55. Defendants Physicians Groups charged patients for a physician visit which is a substantially higher charge, when patients only saw a nurse.

56. Specifically, patients Codi Hall, Teresa Cheathum, Anthony Bowie, Joe Hicks, Jennifer Terry and Elijah Plummer were all billed for a physician visit when in fact they had only

seen the nurse for a brief follow up.  The difference in the charge for a physician visit versus a

nurse visit is approximately $100.00.  This multiplied by hundreds of patients for over 10 years

adds up to millions of dollars Medicare and other government health care programs have

overpaid due to fraudulent billing practices.

57. Defendants Physicians Groups regularly told patients that the charges were the same

whether they saw a nurse or a physician.

58. Defendant Physicians Groups held weekly staff meetings where they told employees,

including Relator, that patients were always to billed at the higher code for physician visits even

if they never saw a physician.

59. Defendants Physicians Groups supervisors Kim Overton and Jack Wier told

employees to always look to add charged to the patient billing sheet, such as magnesium, saline,

aspirin, bandages and other upcharges in order to increase reimbursement amounts.  The

supervisors further instructed employees not to note these charges on the patient charts, only on

the billing sheet.

### BILLING MEDICARE TWICE FOR PROCEDURES AND TESTS THAT WERE PERFORMED ONCE RESULTING IN A SCHEME OF DOUBLE BILLING

60. Defendants Physicians Group engaged in double billing schemes defrauding

Medicare and other government health care systems by millions of dollars.

61. Specifically, patients would come to the clinics where doctors ordered clinical tests,

such as blood work or other laboratory services. Then the clinic would bill Medicare for the tests

that had not yet been performed.  Next Defendant Physicians Group would refer those patients to

Defendant laboratory, (also owned by D. Absolam Tilley), and the Laboratory would bill

Medicare a second time for those same tests.

62. This method of double billing was a regular and routine practice and Relator was told by Kim Overton and Jack Weir to "pre-bill for emergency care so that the bill can be submitted twice" in order to maximize the reimbursement from Medicare.

63. Several patients contacted the Relator to inquire about their bills because they were confused as to why there were multiple charges for the same tests.

64. Relator herself was a patient at the clinic and received multiple bills for the same tests and services.

<u>BILLING FOR MEDICALLY UNECESSARY SERVICES</u>

65. Defendants Physicians Groups regularly and routinely billed for medically unnecessary tests and services.

66. On many occasions employees were instructed to conduct tests or services that were unrelated to the patient's condition or needs.

67. Defendants frequently ordered unnecessary blood work and diagnostic tests.

68. For instance, chemistry panels were often ordered even if the patient had recently had a chemistry panel performed. Similarly, many types of blood work, such as CBC, CMP, TS3, TS4, FreeT3, were routinely ordered without it being medically necessary. Whenever CMP was ordered, the Defendants routinely added a magnesium test.

69. Other examples include ordering Autonomic Nervous System Monitoring (ANSAR) at a cost of $800 each, or ABI tests, at a cost of $550, without any medical need.

70. For instance, if a patient complained that their foot hurt, they ordered ABI tests.

71. Defendants instructed its workers to create a diagnosis to fit the test ordered so that if the government ever audited the files it would appear that there was a basis for the test.

72. Frequently, tests would be billed even before such unnecessary tests were even ordered because it was given that such tests would always be ordered regardless of medical need.

## RETAINING PATIENTS LONGER THAN MEDICALLY NECESSARY

73. Defendants engaged in schemes to intentionally keep patients longer than medically necessary in order to continue to bill Medicare for each extra day of their inpatient stay.  When multiplied by the thousands of patients for which Defendants have improperly extended stays, the amount of improper billing to Medicare extends into the millions of dollars.

74. Specifically, one patient was admitted for respiratory trouble.  After the patient had received a breathing treatment his blood oxygen level was normal and he was ready to be released however, he was held over for two additional days for monitoring and charged for additional breathing treatments when in fact he did not receive any further breathing treatments.

75. Many patients were admitted and held for two to four days for monitoring despite no medical reason.

76. Many of these patients had no idea why they were being held or what they were being monitored for and several patients complained stating there was no need for them to be held and charged for the monitoring.

77. Supervisors told employees including the Relator, that patients were to be held as long as possible in order to bill Medicare for extra days.

78. Relator recalls supervisors stating to employees that elderly patients covered by Medicare should be admitted and held for several days because "they were sure to find something they could bill for."

### PAID OR RECEIVED KICKBACKS AND OTHER IMPROPER ENUMERATIONS, AND ENGAGED IN IMPROPER SELF-REFERRALS TO THE LABORATORY DEFENDANT IN VIOLATION OF FEDERAL LAWS AND REGULATIONS

#### The Anti-Kickback Statute

79. The Anti-Kickback Statute makes it illegal to knowingly and willfully offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. §§ 1320a-7b(b)(2).

80. The regulations issued pursuant to the Anti-Kickback Statute set forth a number of "safe harbors," compliance with which will protect a person from application of the statute. Although each safe harbor has its own specific requirements, most of the safe harbors require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided.

81. Physicians are the primary referral source for laboratories, and thus have the ability to direct substantial business to laboratories.  Laboratories therefore have an incentive to provide remuneration to physicians in order to induce them to refer business to the laboratory, or to reward them for past referrals.

82. The payments described below violate the Anti-Kickback Statute, in that they are made for the purpose of inducing or rewarding referrals of items and services to be paid for by federal and state healthcare programs.

83. Claims violating the Anti-Kickback Statute constitute false claims under the False Claims Act ("FCA"), at 31 U.S.C. § 3729 et seq.

### The Stark Law

84.     Section 1877 of the Social Security Act, 42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its associated regulations, 42 C.F.R. § 411.350 *et seq.* (collectively, the "Stark Law"), provide that, if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services" (DHS), unless the relationship satisfies the requirements of an exception set forth in the Stark Law. It also prohibits an entity from presenting or causing to be presented a bill or claim to anyone for DHS furnished as a result of a prohibited referral.

85.     The Stark Law further provides that an entity may not present or cause to be presented to Medicare a claim for designated health services furnished pursuant to a prohibited referral.  In addition, Medicare is prohibited from making payment on any such claim.

86.     The provisions of the Stark Law have been extended to Medicaid pursuant to Section 1903, 42 U.S.C. § 1396(b) of the Social Security Act and prohibits such referrals.

87.     Under the Stark Law, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement." 42 U.S.C. § 1395nn(a)(2).

88.     The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(A).

89.     The term "remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

90.     The remuneration paid by Laboratory Defendants to Physician Defendants creates "financial relationships" between Laboratory Defendants and their respective referring Physician Defendants under the Stark Law, and no such relationship meets the requirements of any exception under the Stark Law.  Therefore, Laboratory Defendants are prohibited from submitting claims to Medicare and Medicaid for designated health services furnished pursuant to referrals from such Physician Defendants.

91.     The Stark Law contains a number of exceptions, and if an arrangement strictly complies with the requirements of an exception, it will be deemed not to constitute a prohibited financial relationship.  Although each exception has its own specific requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided by the physician.

92.     The payments described below violate the Stark Law, in that they are improper remuneration for which no exception applies.

93. Claims violating the Stark law constitute false claims under the False Claims Act ("FCA"), at 31 U.S.C. § 3729 *et seq*.

<u>The Kickback and self-referral Schemes</u>

94.     As set forth below, Defendants (a group consisting of a clinical laboratory owned by the same person, Dr. Tilley, who owned the Physicians Groups) provided or accepted remuneration for patient referrals to the Defendant Laboratory.

95.     Such remuneration violates the Stark Law, in that it creates a prohibited "financial relationship" between the laboratories and the referring physicians, as defined by the Stark Law. Under the Stark Law, laboratories are prohibited from submitting claims for payment to

Medicare and Medicaid based on referrals from physicians who have a financial relationship with the laboratory.

96.     Such remuneration in exchange for referrals by physicians is also a violation of the federal Anti-Kickback Statute, which prohibits the acceptance of an inducement or reward for patient referrals. As a result of these prohibited referral activities, Defendants submitted numerous false or fraudulent claims for payment to Federal and State healthcare programs.

97.     Laboratory Defendant and the other Defendants have engaged in a pattern of providing or requesting inducements or rewards to physicians for referring business, in violation of the Stark and Anti-Kickback Statutes.  The inducement or reward takes various forms, including, but not limited to:

i.      Defendant doctors regularly ordered laboratory work such as glucose screen or cholesterol screen and submitted a bill to Medicare for laboratory work performed at the clinic. Then Defendant doctors would refer the patient to Defendant laboratory where the actual laboratory work was conducted.

ii.     Defendant laboratory also submitted a bill to Medicare for laboratory work conducted thus billing Medicare twice for work performed once.

iii.    Laboratory billed Medicare for additional tests that were never performed. For example, when Defendant doctor referred patient to Defendant laboratory for Cholesterol and triglyceride tests, the Defendant laboratory performed such tests but billed Medicare for a complete chemistry panel.

iv.     For instance, patients Codi Hall, Teresa Cheathum, Anthony Bowie, Joe Hicks, Jennifer Terry and Elijah Plummer are examples of double billed for laboratory work or having been billed for laboratory work that was never performed or having been billed for a complete

chemistry panel instead of for cholesterol and triglyceride tests which they were suppose to receive.

      v.     Laboratory kicks back cash or other benefit to the physician for Medicare and Medicaid referrals either directly or through commissioned sales staff.

      98.     During the period from 2001 through the present, the Laboratory Defendant engaged in one or more of the above described schemes with one or more other Defendants which resulted in one or more referrals which resulted in false claims.

      99.     During the period from 2001 through the present, each of the Defendants has received improper remuneration from one or more of the Laboratory Defendants which resulted in improper referrals.

      100.    In addition to the referrals to Laboratory Defendants, some physicians diagnose Medicare or Medicaid patients in a manner that results in a higher laboratory revenue for those patients than for similar non-Medicare patients.

      101.    For example, many times patients would come in complaining of a headache. Doctor defendants would intentionally misstate the diagnosis for those patients as having nerve pain in order to bill Medicare and collect higher payments.

      102.    Relator learned of the various schemes by Defendants while working as an employee for various Defendants.

      103.    Relator has had personal conversations with representatives of physician's offices and the laboratory detailing and confirming the various schemes.  These conversations included:

      i.     Weekly discussions with supervisor Jack Wier and co-worker Judy Howard. These conversations took place after several patients had come in complaining of headaches so

that they might receive narcotics and Defendant doctors diagnosed these patients as having a condition other than a headache in order to prescribe the desired narcotics.

    ii.    Further, Relator has records which demonstrate the double billing scheme while she was a patient. Relator was a patient at Defendants clinic and was referred to Laboratory defendant for laboratory work performed. She then received a bill from both Defendant doctor and Laboratory defendant for the identical laboratory work which was only performed once at Defendant laboratory.

    104.    As a result, Laboratory Defendant submitted numerous false claims for payment to Medicare (and other federal healthcare programs).

    105.    The referring Physician Defendants, through their Stark and Anti-Kickback Statute violations have also violated the state and federal False Claims Acts and other federal healthcare programs.

### USING NON CLINICAL OR ADMINISTRSATIVE EMPLOYEES TO PERFORM CLINICAL TESTS AND FRADULENTLY BILLING FOR THOSE TESTS

    106.    Medicare requires all clinical tests to be performed by a licensed clinical employee in order to eligible for reimbursement.

    107.    Medicare requires compliance with state law which states non-clinical employees such as physician assistants must be supervised when performing clinical tests and administrative employees are not allowed to perform any testing as it violated the rules governing the state board; thus, the Medicare requirements supplement rather than replace state law. Although the Medicare supervisory rules are written as clinical requirements, billing the Medicare program for procedures that were not properly supervised subjects the provider to liability for overpayments and, possibly, allegations of Medicare fraud.

108.    Defendants Physicians Groups regularly instructed non clinical employees, such as the receptionist, to perform clinical tests that require a licensed clinical employee to perform.

109.    Defendants Physicians Groups billed Medicare for the clinical test in violation of federal regulations.

110.    For example, Defendants Physicians Groups supervisors ordering the receptionist, who is a non clinical administrative employee to perform clinical tests such as MRI scans, Autonomic Nervous System Monitoring (ANSAR), Blood Monitoring Tests: (ABI) and (PFT).

111.    Defendants Physicians Groups then billed Medicare for the clinical tests in violation of federal regulations.

## DEFENDANTS USED COMPANY AND CORPORATE ACCOUNTS TO PAY PERSONAL EXPENSES

112.    Defendants used company or corporate accounts to pay personal expenses such as personal taxes, vacations and other expenses.

113.     Defendants did not repay corporate accounts, but instead created a false expense in order to obtain the money they needed to pay the personal expense.

114.    Physicians were using the clinics as their personal "piggy banks." Upon information and belief, Defendants improperly passed on such expenses to government programs and engaged in the various schemes to gain improper enumeration from the government to cover such expenditures.

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1) & (a)(1)(A)

115.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 114 as though fully set forth herein.

116.    As set forth above, Defendants knowingly presented false or fraudulent claims for

payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1) (1990) and 31 U.S.C. § 3729(a)(1)(A) (2009 amendments).

117.   By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(2) & (a)(1)(B)

118.   Relator incorporates by reference the allegations set forth in paragraphs 1 through 114 as though fully set forth herein.

119.   As set forth above, Defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2) (1990) and 31 U.S.C. § 3729(a)(1)(B) (2009 amendments).

120.   By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(3) & (a)(1)(C)

121.   Relator incorporates by reference the allegations set forth in paragraphs 1 through 114 as though fully set forth herein.

122.   As set forth above, Defendants knowingly conspired to commit a violation of the False Claims Act in violation of 31 U.S.C. § 3729(a)(3) (1990) and 31 U.S.C. § 3729(a)(1)(C) (2009 amendments).

123.    By virtue of the false records or statements made by the Defendants, the United

States suffered actual damages and therefore is entitled to multiple damages under the False

Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT IV**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(7) & (a)(1)(G)**

124.    Relator incorporates by reference the allegations set forth in paragraphs 1 through

114 as though fully set forth herein.

125.    As set forth above, Defendants knowingly made, used, or caused to be made or

used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money or property to the Government in violation of 31 U.S.C. § 3729(a)(7) (1990) and 31

U.S.C. § 3729(a)(1)(G) (2009 amendments)..

126.    By virtue of the false records or statements made by the Defendants, the United

States suffered actual damages and therefore is entitled to multiple damages under the False

Claims Act, to be determined at trial, plus a civil penalty for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, the United States and Relator alleges that the Defendants improperly

obtained millions of dollars per year from government healthcare programs and demand that

judgment be entered against the Defendants and in favor of the Relator and the United States as

follows:

127.    On the First, Second, Third and Fourth Causes of Action under the False Claims

Act, as amended, for the amount of the United States' damages, multiplied by three as required

by law, and such civil penalties as are permitted or required by law;

128.    That the Relator be awarded the maximum share amount allowed pursuant to 31

U.S.C. § 3730(d);

129.    That the Relator be awarded all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d).

130.    That the United States and Relator receive all such other relief as may be just and proper.

131.    Relator Demands a trial by struck jury.

Respectfully submitted,

_____
Paul Byrd, AR Bar No. 85020
Hare, Wynn, Newell & Newton, LLP
Metropolitan Nat'l Plaza
4220 N. Rodney Parham Rd. Suite 250
Little Rock, Arkansas 72212
(501) 225-5500
(205) 324- 2165 fax
paulbyrd@hwnn.com


_____
Don McKenna
Hare, Wynn, Newell & Newton, LLP
2025 3rd Ave. N. Suite 800
Birmingham, AL 35203
(205) 328-5330
(205) 324-2165 fax
don@hwnn.com


_____
Joel Hesch (*pro hac pending*)
Attorney at Law
3540 Ridgecroft Dr.
Lynchburg, VA  24503
Phone: (434) 592-4251

*Attorneys for Relator*

Dated:  October 7 , 2010